UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| JAY BANKS,<br><br>        Plaintiff,<br><br>v.<br><br><br>UNITED PARCEL SERVICE,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS IN PART**<br><br>Case No. 4:23-cv-00067-AMA-PK<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Paul Kohler |

This matter comes before the Court on a Motion for Judgment on the Pleadings in Part filed by Defendant United Parcel Service.[1] For the reasons discussed below, the Court grants Defendant's Motion in part and denies Defendant's Motion in part.

## BACKGROUND[2]

Plaintiff Jay Banks began working for Defendant United Parcel Service ("UPS") as a full-time package car driver in October 2000.[3] As a package car driver, Mr. Banks spent

---

[1] ECF No. 47, filed June 24, 2025.

[2] The facts below are, unless otherwise stated, taken from Plaintiff's Third Amended Complaint ("TAC"). ECF No. 41. This Complaint appears to be mistitled, as it was filed pursuant to the Court's granting leave for Plaintiff to file a Second Amended Complaint. ECF No. 40. Furthermore, a review of the docket reveals that the complaint previously operative was the amended complaint, ECF No. 14, and thus this Complaint is only the second amended complaint. However, to avoid confusion and to conform with how the Parties have referenced the Complaint in the briefing for the instant Motion, the Court will refer to the Complaint in accordance with its title as the TAC. For the purposes of the Motion at issue, the Court will treat the facts alleged in the TAC as true.

[3] ECF No. 41 ¶ 11.

1

approximately eight to eleven hours per day in his UPS truck.[4] Mr. Banks worked out of the UPS center in West Valley City, Utah from the commencement of his employment to February 2016,[5] after which, in April 2016, he transferred to the UPS center in Moab, Utah.[6] Around two years later, in May 2018, Mr. Banks transferred to the UPS center in Casa Grande, Arizona.[7] At the time he began working in Casa Grande, Mr. Banks was earning approximately thirty-five dollars per hour.[8]

During the period of time relevant to the instant action, the employment relationship between Mr. Banks and UPS was governed by a collective bargaining agreement, the 2018-2023 National Master UPS Agreement (the "Master CBA"),[9] as well as a supplemental collective bargaining agreement, the 2018-2023 Western Region of Teamsters UPS Supplemental Agreement ("Supplemental CBA").[10] The Supplemental CBA provides that for package car drivers,

> [t]he regular scheduled work day shall consist of eight (8) consecutive hours, with an established start time, excluding a non paid meal period of either one half (1/2) or one (1) hour as provided in each respective area or local Addendum or Rider. The regular scheduled work week shall consist of five (5) consecutive eight (8) hour days Monday through Friday or Tuesday through Saturday . . .[11]

---

[4] *Id.*

[5] *Id.* ¶ 12.

[6] *Id.* ¶ 13.

[7] *Id.* ¶ 14.

[8] *Id.* ¶ 16.

[9] *Id.* ¶ 25; ECF No. 42 Ex. 1.

[10] ECF No. 41 ¶ 26; ECF No. 42, Ex. 1.

[11] ECF No. 42, Ex. 1 at 212, art. 20 § 2(a). The information regarding the terms of the Supplemental CBA is taken from the Supplemental CBA itself, as Mr. Banks references the agreement in his Complaint and UPS has attached it as an exhibit to its Answer. "Documents attached to the pleadings . . . are subject to full consideration in a court's review of a Rule 12(c) motion." *U.S. v. Zazi*, 356 F. Supp. 3d 1105, 1114 (D. Colo. 2018) (citing *Park Univ. Enters., Inc. v. Am. Gas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)).

Regarding transfers for full-time employees,[12] the Supplemental CBA provides that "[a]ll full-time package car drivers covered by this Agreement, with one (1) year seniority, shall have the right to transfer according to" several provisions the Supplemental CBA sets forth.[13] First, a transfer list will be posted in each center during the month of October,[14] and "[p]ackage car drivers interested in transferring . . . in the following year must sign th[e center] transfer list designating the building requested."[15] These transfer lists are then combined to form a Master Transfer Roster by December 1, and a copy is given to all Local Unions signatory to the Agreement.[16] Subsequently, "[a]t the time of notification, package car drivers actively working in their classification, with good records, in accordance with their package car driver seniority, are given first consideration in filling openings before new people are hired."[17] Failure to accept or reject the available transfer within the requisite time period "will result in the employee being removed from the list."[18]

On May 24, 2018, Mr. Banks was delivering on his route in Casa Grande when he experienced, on account of the heat, severe cramping, vomiting, diarrhea, and loss of consciousness.[19] Mr. Banks continued struggling with symptoms of heat exhaustion and heat stroke while working over the next two weeks[20] until he suffered another severe health incident

---

[12] *See* ECF No. 41 ¶ 26.
[13] ECF No. 42, Ex. 1 at 202, art. 6 § 6; *see also* ECF No. 41 ¶ 26.
[14] ECF No. 42, Ex. 1 at 202, art. 6 § 6(1); *see also* ECF No. 41 ¶ 26.
[15] ECF No. 42, Ex. 1 at 202, art. 6 § 6(2); *see also* ECF No. 41 ¶ 26.
[16] ECF No. 42, Ex. 1 at 202–203, art. 6 § 6(3); *see also* ECF No. 41 ¶ 26.
[17] ECF No. 42, Ex. 1 at 203, art. 6 § 6(5); *see also* ECF No. 41 ¶ 26. In the TAC, Mr. Banks summarizes this provision as follows: "Thereafter, package car drivers who are actively working and have good work records who have requested transfers are given first consideration for filling vacancies and openings (in accordance with their seniority) before new people are considered to fill vacancies and openings."
[18] ECF No. 42, Ex. 1 at 203, art. 6 § 6(5).
[19] ECF No. 41 ¶ 17.
[20] *Id*. ¶ 18.

on June 6, 2018, during which he experienced vomiting, diarrhea, and mental confusion.[21] Following this incident, Mr. Banks requested and was granted a week off of work so that he could see a doctor about his health concerns.[22]

On June 13, 2018, Mr. Banks visited his medical provider, who determined that Mr. Banks had developed a type of thyroid disease that, when working in high temperatures, would cause him to suffer from heat exhaustion, reflex syncope or pre-syncope, muscle cramps, diarrhea, lightheadedness, and difficulty concentrating.[23] The medical provider opined that this thyroid condition was permanent[24] and wrote a letter stating that Mr. Banks needed to be transferred to a location with a cooler climate or, if he stayed in Arizona, that he needed to be assigned to a night shift and/or an indoor shift.[25]

The next day, Mr. Banks informed his supervisor in Casa Grande about his health condition and his doctor's recommendation that he transfer to a cooler climate.[26] The supervisor indicated that a transfer back to Moab, Utah may be possible, and he advised Mr. Banks to contact UPS's Human Resources Department ("HR") about the issue.[27] Accordingly, Mr. Banks contacted Colton Smith, an HR representative in Salt Lake City, Utah, to explain his diagnosis and his doctor's recommendations, as well as to request a transfer to the position in Moab that he had vacated a few weeks before.[28] Mr. Smith suggested the transfer back to Moab might be possible and told Mr. Banks to contact UPS's Labor Relations Department.[29] Mr. Banks then

---

[21] *Id.* ¶ 19.
[22] *Id.* ¶ 20.
[23] *Id.* ¶ 21.
[24] *Id.*
[25] *Id.* ¶ 24.
[26] *Id.* ¶ 27.
[27] *Id.* ¶ 28.
[28] *Id.* ¶ 29.
[29] *Id.*

reached out to a Union Representative in Salt Lake City, who also indicated that the transfer to Moab may be possible.[30] The Union Representative said that he would consult Tyler Hodgson of UPS's Labor Relations Department about the issue.[31] On June 21, 2018, Mr. Smith contacted Mr. Banks and informed him that Mr. Hodgson would not allow the transfer back to Moab.[32] Mr. Banks was not given a reason for this decision.[33]

Mr. Banks then sought leave under the Family and Medical Leave Act ("FMLA"), which UPS approved,[34] and continued to seek a transfer. On July 3, 2018, Mr. Banks reached out to Ricardo Garayear, an HR representative in Arizona, but Mr. Garayear did not respond to Mr. Banks's inquiries.[35] On July 17, 2018, Mr. Banks submitted accommodation paperwork in which his medical provider opined that Mr. Banks could perform all functions of the package car driver position in a cooler climate.[36] On July 18, 2018, Mr. Banks contacted Nicole Campbell, another HR representative in Arizona.[37] Ms. Campbell told Mr. Banks that he was not currently eligible for transfer under the terms of the CBA, as he had not put his name on the December 2017 transfer list, and that he would need to put his name on the December 2018 transfer list in order to be eligible for transfer in 2019.[38] On July 24, 2018, Mr. Banks contacted John O'Riordan, the UPS regional manager over the Southeastern Utah and Western Colorado area, and Mr. O'Riordan informed Mr. Banks that his former package car driver position in Moab was still

---

[30] *Id.* ¶ 30.
[31] *Id.*
[32] *Id.* ¶ 31.
[33] *Id.*
[34] *Id.* ¶¶ 32–33.
[35] *Id.* ¶ 34.
[36] *Id.* ¶¶ 38–39.
[37] *Id.* ¶ 35.
[38] *Id.* ¶ 36.

open.[39] Mr. Banks approached Ms. Campbell about open package car driver positions and was again told that he was not eligible for transfer in accordance with the CBA.[40] Ms. Campbell informed Mr. Banks that if he wanted one of the open UPS driver positions imminently, he would have to resign and seek to be rehired.[41]

On August 8, 2018, Mr. Banks used his last available FMLA absence.[42] Mr. Banks contacted Jill Cude, an HR representative in Salt Lake City, and provided her a letter from his medical provider, which stated that Mr. Banks "cannot have long exposure to heat, over 90 degrees for 5-6 consecutive hours per day. He can work in temperatures above 90[,] but just for shorter periods around 1-4 hours per day."[43] The letter also provided that Mr. Banks "has worked better in the cooler temperatures of Moab versus the high temperatures of Phoenix."[44] Ms. Cude, however, expressed concern regarding whether Mr. Banks would able to work in Salt Lake City, as there are forty-two days a year where the temperature reaches 90 degrees or higher.[45]

On September 21, 2018, Mr. Banks tendered his resignation from UPS.[46] Several months after resigning, in January 2019, Mr. Banks applied and was interviewed for a full-time package car driver position in West Valley City.[47] In March 2019, Mr. Banks was informed that there was a hiring freeze that impacted the position.[48] On April 26, 2019, Mr. Banks was told the hiring freeze had been lifted, but that UPS would be hiring internally for the position.[49] The HR

---

[39] *Id.* ¶ 40.
[40] *Id.* ¶ 42.
[41] *Id.* ¶ 45.
[42] *Id.* ¶ 47.
[43] *Id.* ¶ 49 (alteration in original).
[44] *Id.*
[45] *Id.* ¶ 50.
[46] *Id.* ¶ 56.
[47] *Id.* ¶ 58.
[48] *Id.* ¶ 62.
[49] *Id.* ¶ 63.

representative stated that she would reach out to Mr. Banks if there were still available openings after the internal hires had been made.[50] On May 15, 2019, the HR representative contacted Banks and informed him that UPS would be hiring outside candidates.[51] However, Mr. Banks was not selected for the position.[52] The HR representative suggested that Mr. Banks should apply for a part-time package handler position so that, if hired, he could put his name on the internal list for consideration for a full-time position.[53]

In late May 2019, Mr. Banks applied for a part-time package handler position in Salt Lake City.[54] Mr. Banks also found two open full-time package driver positions, one of which was in Moab, and the other in Gillette, Wyoming.[55] Mr. Banks talked to a supervisor in the Moab center, who told him that Mr. O'Riordan would not offer Mr. Banks an interview for the position.[56] Mr. Banks then reached out to the center manager for Gillette who initially expressed interest in hiring Mr. Banks but then, after speaking with HR, informed Mr. Banks that there was a "real concern about [Mr. Banks's] stability and engagement to stay in Gillette."[57]

On June 4, 2019, UPS hired Mr. Banks for the part-time package car driver position in Salt Lake City.[58] Mr. Banks immediately put his name on the internal list for consideration for a full-time package car driver position.[59] Additionally, at that time, there was an available position for a 22.4 combination driver, which is a full-time hybrid position that includes driving shifts as

---

[50] *Id.*
[51] *Id.* ¶ 64.
[52] *Id.*
[53] *Id.* ¶ 66.
[54] *Id.* ¶ 67.
[55] *Id.* ¶ 68.
[56] *Id.* ¶ 70.
[57] *Id.* ¶¶ 71–73.
[58] *Id.* ¶ 75.
[59] *Id.*

well as indoor shifts.[60] At the end of June 2019, Mr. Banks applied and was subsequently hired

for a 22.4 combination driver position at the Mountain View center in Salt Lake City.[61]

January 2020 Moab, Utah Vacancy

In late January 2020, Mr. Banks became aware of an open, full-time package car driver

position in Moab.[62] Mr. Banks attempted to apply online for the position; however, after filling

out the initial forms, the remainder of the application was blocked such that Mr. Banks could not

submit the application.[63] Mr. Banks then texted Mr. O'Riordan about wanting to apply for the

position in Moab.[64] Mr. Banks also called Mr. Hodgson.[65] Mr. Hodgson informed Mr. Banks that

Mr. O'Riordan had no interest in hiring Mr. Banks.[66]

On April 2, 2020, Mr. Banks, concerned that he was not earning enough as a 22.4 driver

to meet his expenses, resigned from that position.[67] On October 22, 2020, Mr. Banks filed a

Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"),

complaining that UPS's refusal to hire him for the full-time package car driver position in

January 2020 was a form of discrimination on the basis of disability.[68]

---

[60] *Id.* ¶ 76.
[61] *Id.* ¶ 78.
[62] *Id.* ¶ 82.
[63] *Id.* ¶ 84.
[64] *Id.* ¶ 85.
[65] *Id.*
[66] *Id.*
[67] *Id.* ¶ 88.
[68] *Id.* ¶ 91.

August 2020 Gypsum, Colorado Vacancy

Having resigned, Mr. Banks applied for an open, full-time package car driver position in Gypsum Colorado on August 26, 2020.[69] Mr. O'Riordan did not select Mr. Banks for the position.[70]

November 2020 Moab, Utah Vacancy

On November 2, 2020, Mr. Banks applied for another open, full-time package car driver position in Moab.[71] Again, Mr. O'Riordan did not select Mr. Banks for the position.[72]

On March 9, 2021, Mr. Banks filed another Charge of Discrimination with the EEOC, complaining about UPS's refusal to hire him for the full-time package car driver positions in August and November 2020.[73]

Procedural History of the Instant Action

Mr. Banks initiated the action in this Court on August 30, 2023.[74] Following UPS's previous Motion for Judgment on the Pleadings,[75] which the Court denied without prejudice,[76] the Parties stipulated to dismiss with prejudice all claims based on adverse employment actions alleged to have occurred before January 2020, as such claims are time-barred.[77] Mr. Banks then

---

[69] *Id.* ¶ 89.
[70] *Id.* ¶ 90.
[71] *Id.* ¶ 92.
[72] *Id.* ¶ 93.
[73] *Id.* ¶ 94.
[74] ECF No. 1.
[75] ECF No. 25.
[76] ECF Nos. 33, 36.
[77] ECF No. 35; *see also* ECF No. 33.

sought leave to file a Second Amended Complaint,[78] which the Court granted in part and denied in part,[79] and Mr. Banks then filed his TAC.[80]

UPS filed the instant Motion for Judgment on the Pleadings in Part on June 24, 2025.[81] Mr. Banks filed his Opposition on July 21, 2025,[82] and UPS's Reply was filed on August 4, 2025.[83]

## LEGAL STANDARD

Courts apply the same standard in reviewing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as they do in reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[84] Accordingly, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[85] As with a Rule 12(b)(6) motion, in construing a plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all reasonable inferences in the light most favorable to the plaintiff.[86] "Documents attached to the pleadings . . . are subject to full consideration in a court's

---

[78] ECF No. 37.
[79] ECF No. 40.
[80] ECF No. 41.
[81] ECF No. 47.
[82] ECF No. 49.
[83] ECF No. 50.
[84] *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1302 (10th Cir. 2021).
[85] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[86] *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

review of a Rule 12(c) motion."[87] Furthermore, "facts subject to judicial notice may be considered . . . without converting the motion . . . into a motion for summary judgment."[88]

## DISCUSSION

In Mr. Banks's TAC, he asserts disability discrimination claims in violation of the Americans with Disabilities Act ("ADA") in relation to three adverse employment actions: (1) the failure to promote to the Moab, Utah position in January 2020, (2) the failure to hire for the Gypsum, Colorado position in August 2020, and (3) the failure to hire for the Moab, Utah position in November 2020.[89] He also asserts claims for retaliation in violation of the ADA related to those same three adverse employment actions.[90] UPS seeks judgment on the pleadings on the ADA discrimination claim for the January 2020 failure to promote, the ADA discrimination claim for the November 2020 failure to hire, and all three of Mr. Banks's ADA retaliation claims. UPS does not move for judgment on the pleadings on the ADA discrimination claim for the August 2020 failure to hire. Accordingly, the Court will not address that claim but will address the other claims in turn.

## A.    DISCRIMINATION

As stated above, UPS contends that it is entitled to judgment on the pleadings on Mr. Bank's ADA discrimination claim for UPS's failure to promote him to the position in Moab in January 2020, as well as on Mr. Bank's ADA discrimination claim for UPS's failure to hire him for the position in Moab in November 2020.

---

[87] *Zazi*, 356 F. Supp. 3d at 1114.
[88] *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *see also Zazi*, 356 F. Supp. 3d at 1114 ("[A] district court may consider facts subject to judicial notice such as matters of public record without converting a Rule 12(c) motion into a summary judgment motion.").
[89] ECF No. 41 ¶¶ 96–122.
[90] *Id*. ¶¶ 123–137.

1.    **Discriminatory Failure to Promote**[91]

To establish a prima facie case for the failure to promote under the ADA,[92] a plaintiff

must show

> (1) he has a "disability" within the meaning of the [ADA]; (2) he was qualified, with or
> without reasonable accommodation, to perform the essential job functions of the position
> he sought; and (3) his employer refused the promotion under circumstances which give
> rise to an inference the decision was based on his disability.[93]

UPS argues that Mr. Banks has failed to allege sufficient facts showing that he was qualified for

the promotion and transfer to Moab in January 2020 because he has failed to allege that he was

eligible for such a promotion and transfer under the terms of the Supplemental CBA. The Court

agrees.

"[T]he ADA defines 'qualified individual' as 'an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires.'"[94] A plaintiff must, to demonstrate that he was a qualified

individual, "first establish that he had 'the requisite skill, experience, education and other job-

related requirements of the employment position.'"[95] "Second, he must establish that he can

---

[91] As Mr. Banks was working for UPS as a 22.4 combination driver at this time, his moving to
the open package car driver position would have entailed a promotion. Thus, the Court finds it
appropriate to view this claim as a failure-to-promote claim, in accordance with how UPS has
framed the claim in its Motion.

[92] ADA discrimination claims based on circumstantial evidence are subject to the burden-shifting
framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework,
"[a]fter a plaintiff has made the requisite [prima facie] showing, the burden shifts to the
defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant
proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's
stated reasons are merely 'pretextual.'" *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1038 (10th Cir.
2011) (internal citation omitted).

[93] *Rakity v. Dillon Cos.*, 302 F.3d 1152, 1164 (10th Cir. 2002).

[94] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (quoting 42 U.S.C. § 12111(8)).

[95] *Id.* (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001)).

perform the 'essential functions' of the position."[96] In relation to this second prong, courts look first to "whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions."[97]

Here, Mr. Banks has failed to allege sufficient facts to show that he had the requisite job-related requirements of the position such that he was a qualified individual. According to Mr. Banks's TAC, the Supplemental CBA that governed, in part, his employment relationship with UPS provides that all full-time package car drivers with one-year seniority could request a transfer to another UPS location by putting their name on a transfer list and designating their requested location.[98] This process occurs during the month of October each year, and the transfer list is then finalized by the first of December.[99] The TAC states that, "[t]hereafter, package car drivers who are actively working and have good work records who have requested transfers are given first consideration for filling vacancies and openings (in accordance with their seniority) before [outside candidates] are considered to fill vacancies and openings."[100] Thus, based on Mr. Banks's allegations, having one-year seniority and requesting a transfer by signing the transfer list—and consequently, being eligible for transfer under the Supplemental CBA—are job-related requirements of the transfer Mr. Banks sought. Mr. Banks does not, however, allege that he had one-year seniority or that he put the requisite information on the transfer list finalized in December 2019.

---

[96] *Id.*

[97] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003).

[98] ECF No. 41 ¶ 26.

[99] *Id.*

[100] *Id.*

Despite this, Mr. Banks argues that he was eligible for transfer even if he lacked one-year seniority and did not sign the transfer list. According to Mr. Banks, the Supplemental CBA creates three categories relevant in the context of transfers: (1) package car drivers with one-year seniority who put their names on the transfer list; (2) package car drivers who are actively working and who have good records but do not have one-year seniority and have not put their names on the transfer list; and (3) outside candidates. In Mr. Banks's view, drivers in the second category are, although considered after the drivers in the first category, eligible for transfer and are considered before outside candidates.

This interpretation does not comport with the plain language of the Supplemental CBA. Pursuant to that agreement, "[a]ll full-time package car drivers covered by this Agreement, with one (1) year seniority, shall have the right to transfer according to paragraphs (1) through (10) below."[101] Those paragraphs, in relevant part, outline the process for transfers. First, a transfer list will be posted in each center during the month of October, and "[p]ackage car drivers interested in transferring . . . in the following year must sign th[e] transfer list designating the building requested."[102] These transfer lists are combined to form a Master Transfer Roster by December 1, and a copy is given to all Local Unions signatory to the Agreement.[103] Subsequently, as subsection 5 states, "[a]t the time of notification, package car drivers actively working in their classification, with good records, in accordance with their package car driver seniority, are given first consideration in filling openings before new people are hired."[104]

---

[101] ECF No. 42, Ex. 1 at 202, art. 6 § 6.
[102] ECF No. 42, Ex. 1 at 202, art. 6 § 6(1)–(2).
[103] ECF No. 42, Ex. 1 at 202–203, art. 6 § 6(3).
[104] ECF No. 42, Ex. 1 at 203, art. 6 § 6(5).

Subsection 5 further provides that the failure to accept or reject the available transfer within the requisite time period "will result in the employee being removed from the list."[105]

Mr. Banks construes the first sentence of subsection 5 to mean that any package car driver actively working in his classification and with good records may be considered for transfer regardless of whether the driver's information is on the Master Transfer Roster. This reading, however, conflicts with the subsection itself as well as the section as a whole. The subsection provides that employees who fail to timely accept or reject the transfer will be removed from the Master Transfer Roster. Accordingly, the "package car drivers" referred to in the first sentence of the subsection must be those whose names are on that list. Moreover, nowhere in the relevant section of the Supplemental CBA is it stated that full-time drivers without one year of seniority and whose names are not listed on the Master Transfer Roster have the right to transfer. Rather, it is clear that drivers with one-year seniority shall have that right pursuant to the process the section sets forth. Thus, according to the Supplemental CBA, in order to be eligible for a transfer, a driver must have one-year seniority and must be listed on the Master Transfer Roster.

Again, Mr. Banks has not alleged that he had one-year seniority or that he put his name on the list. In fact, the allegations show that he did not have one year of seniority at this time, as he was only hired as a 22.4 combination driver at the end of June 2019.[106] As such, Mr. Banks has failed to allege that he was eligible for or had the right to transfer—in other words, he has failed to allege that he met the job-related requirements of the position he desired.[107] Because

---

[105] *Id.*

[106] ECF No. 41 ¶ 78.

[107] The Court wishes to note that Mr. Banks, in his TAC, posits legal argumentation concerning whether a reasonable accommodation under the ADA should "trump" the requirements of the Supplemental CBA. The Court will not delve into this issue for several reasons. First, legal argumentation is inappropriate in the context of a complaint. *Freeman v. Raytheon Techs. Corp.*, No. 22-cv-01161-RM-NYW, 2022 WL 2437834, at *2 (D. Colo. July 5, 2022). Second, Mr.

Mr. Banks has failed to allege that he met the job-related requirements of the position he desired, he has failed to plead sufficient facts that, if taken as true, would establish the second element of his failure-to-promote claim, which requires Mr. Banks to make a showing that he was qualified for his desired position. [108] UPS is therefore entitled to judgment on the pleadings on this claim, and this claim is dismissed with prejudice.[109]

### 2.    Discriminatory Failure to Hire

To establish a prima facie case for failure to hire under the ADA, a plaintiff must show

> (1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is qualified, that is, [he] is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer [failed to hire him] under circumstances which give rise to an inference that the [failure to hire] was based on [his] disability.[110]

As with the failure-to-promote claim, UPS contests the second element, asserting that Banks has failed to adequately allege that he was capable of performing the essential functions of the

---

Banks does not allege that the transfer sought in January 2020 was related to a request for reasonable accommodation. Indeed, when Mr. Banks requested reasonable accommodations in 2018, he sought to be transferred to Salt Lake City, which is where he was employed at the time he sought the January 2020 transfer. Mr. Banks does not suggest that his work in Salt Lake City was impacting his thyroid condition.

[108] Whether a plaintiff satisfies the requisite skill, experience, and other job-related requirements of an employment position is a "condition to performing the essential functions of" that position. *Tate*, 268 F.3d at 993. Accordingly, as Mr. Banks has failed to allege that he met the threshold eligibility for the position he desired, the Court need not reach whether Mr. Banks has adequately alleged that he was able, with or without reasonable accommodation, to perform the essential functions of the position.

[109] *See Pena v. Greffet*, 110 F. Supp.3d 1103, 1112 (D.N.M. 2015) ("Claims dismissed pursuant to a motion under rule 12(c) are dismissed with prejudice"); *Young v. Young*, No. 2:17-cv-00082, 2018 WL 4643003, at *3 (D. Utah Sept. 27, 2018) (dismissing claims with prejudice when judgment on the pleadings in favor of the defendants was appropriate).

[110] *Wheeler v. IHC Health Servs.*, No. 1:23-cv-00014, 2023 WL 3391531, at *3 (D. Utah May 11, 2023) (alterations in original); *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (stating analogous elements for a discriminatory termination claim under the ADA).

November 2020 position. The Court is not persuaded by UPS's arguments with regard to this claim.

To reiterate, "the ADA defines 'qualified individual' as 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"[111] To demonstrate that a plaintiff is a qualified individual, the plaintiff must initially "establish that he had 'the requisite skill, experience, education and other job-related requirements of the employment position.'"[112] Then, "he must establish that he can perform the 'essential functions' of the position."[113] Courts look first to "whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions."[114]

UPS does not suggest that Mr. Banks did not meet the threshold job-related requirements for the Moab position in November 2020—as he was not employed by UPS at this point and was not seeking a transfer, he was not subject to the Supplemental CBA's transfer requirements. Furthermore, Mr. Banks does not appear to dispute that he would be incapable of performing the essential functions of the position without reasonable accommodation, arguing and alleging, rather, that he could perform those functions with such accommodation. Thus, the Court's inquiry will focus on whether Mr. Banks has alleged facts that plausibly give rise to an inference that he, with reasonable accommodation, could perform the essential functions of the position.

---

[111] *Lincoln*, 900 F.3d at 1192.
[112] *Id.*
[113] *Id.*
[114] *Davidson*, 337 F.3d at 1190.

The allegations state that, according to Mr. Banks's medical provider, he must avoid long exposure to heat such that he cannot work in conditions over 90 degrees for five to six consecutive hours per day.[115] He can still work in temperatures above 90 degrees but for shorter periods of around one to four hours per day.[116] UPS argues that due to these restrictions, Mr. Banks is medically unable to work in Moab on account of the hot conditions there. In doing so, UPS asks the Court to take judicial notice that Moab has a desert climate, with high temperatures that range from 90 to over 100 degrees from May to September.

"Courts take judicial notice of facts generally known and accepted," and "[t]his rule applies to general climatic conditions."[117] Thus, the Court will take judicial notice of the National Weather Service data, which indicates that, from 2019 to 2024, the monthly highest maximum temperature for Moab, Utah from May to September was, on average, above 90 degrees.[118] Nonetheless, even taking judicial notice of this data, the Court agrees with Mr. Banks that the information is not dispositive. As Mr. Banks argues, the data does not reflect when during the day—and for how long—the temperature generally exceeds 90 degrees. Such information is relevant because Mr. Banks alleges that he could be reasonably accommodated in the form of a modified schedule pursuant to which Mr. Banks would make deliveries in the early to mid-mornings or later in the evenings.[119] Mr. Banks argues that he could work from 6:00 a.m. to 2:00 p.m., or from 7:00 a.m. to 3:00 p.m., and thereby avoid long exposure to conditions over 90 degrees.

---

[115] ECF No. 41 ¶ 49.
[116] *Id.*
[117] *Spillway Marina, Inc. v. U.S.,* 445 F.2d 876, 878 (10th Cir. 1971).
[118] ECF No. 47, Ex. B.
[119] Under the ADA, "reasonable accommodation" may include "modified work schedules[.]" *Aubrey v. Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020) (quoting 42 U.S.C. § 12111(9)).

UPS contends that Mr. Banks's proposed alternative work schedules would violate his medical restrictions because, according to UPS, the alleged essential job functions require Mr. Banks to be medically able to work up to eleven hours a day. An essential function of a position is determined by considering several factors, including

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the time spent performing the particular function; (4) the consequences if the individual cannot perform the function; (5) any collective-bargaining agreement; (6) the work experience of those in the position in the past; and (7) the current work experience of those in similar positions.[120]

UPS asserts that Mr. Banks has alleged that the essential job functions of a full-time package driver include spending approximately eight to eleven hours per day in a UPS truck. This appears to overstate Mr. Banks's allegations. Mr. Banks alleges that "[a]s a package car driver, Mr. Banks spent approximately eight to eleven hours per day in his UPS truck."[121] Even taking this as true, it does not necessarily follow that spending up to eleven hours per day in the UPS truck is an *essential* function of the position or that Mr. Banks is alleging such. Indeed, the Supplemental CBA suggests otherwise—the agreement provides that for package car drivers "[t]he regular scheduled work day shall consist of eight (8) consecutive hours, with an established start time, excluding a non paid meal period of either one half (1/2) or one (1) hour."[122] Thus, with the information presently before the Court and having to draw reasonable inferences in Mr. Banks's favor, the Court cannot infer that working up to eleven hours per day in the UPS truck is an essential function of the position. Rather, in accordance with the Supplemental CBA, the reasonable inference is that package car drivers must be able to work eight hours per day.

---

[120] *Adair v. City of Muskogee*, 823 F.3d 1297, 1307 (10th Cir. 2016) (citing 29 C.F.R. § 1630.2(n)(3)).
[121] ECF No. 41 ¶ 11.
[122] ECF No. 42, Ex. 1 at 212, art. 20 § 2(a).

UPS also contends that Mr. Banks's proposed alternative schedules would violate his medical restrictions because those restrictions could render him unable to work for over one hour in 90-degree heat. But Mr. Banks has alleged that, according to his medical provider, he is restricted from *long* exposure—five to six consecutive hours—to conditions over 90 degrees.[123] This does not suggest that he would be unable to work for over one hour in 90-degree heat. Rather, Mr. Banks alleges that he can work for four consecutive hours in heat above 90 degrees,[124] as confirmed by his medical provider.[125] The inference based on these allegations is that Mr. Banks could work in over 90-degree temperatures for up to four hours of his eight-hour workday.

Because, based on Mr. Banks's allegations, it can be inferred that Mr. Banks could work in over 90-degree temperatures for up to four hours of his eight-hour workday and because of the outstanding question of fact regarding what time temperatures in Moab generally exceed 90 degrees, the Court cannot conclude at this point that Mr. Banks's proposed alternative work schedules necessarily violate his medical restrictions. Instead, it seems plausible that Mr. Banks could work early in the morning when temperatures are likely cooler and then only work for a short period of time in temperatures exceeding 90 degrees. UPS has not offered any other reason why such a modification in schedule would be unreasonable. Therefore, Mr. Banks has alleged sufficient facts to give rise to a reasonable inference that he could perform the essential functions of the position with a reasonable accommodation and was thus qualified for the position. The Court will deny judgment on the pleadings on this claim.

---

[123] ECF No. 41 ¶ 49.
[124] ECF No. 41 ¶ 51.
[125] ECF No. 41 ¶ 49.

**B.    RETALIATION**

Mr. Banks claims that in January 2020, August 2020, and November 2020, UPS did not select him for open full-time package car driver positions in retaliation for his requesting reasonable accommodations from June 2018 to August 2018.[126] In relation to the November 2020 failure to hire, Mr. Banks also alleges that he was retaliated against for filing his EEOC charge in October 2020;[127] however, Mr. Banks has conceded that there are insufficient facts pleaded to support a causal connection between his filing of the EEOC charge and the denial of his application in November 2020.[128] The Court will thus focus only on the requests for accommodation. UPS argues that Mr. Banks has failed to allege a causal connection between the accommodation requests and the three adverse actions. The Court agrees.

To establish a prima facie case for ADA retaliation,[129] a plaintiff must show that he "(1) engaged in protected activity; (2) suffered a material adverse action; and (3) a causal connection exists between the protected activity and the adverse action."[130] "To establish a causal connection, a plaintiff must present evidence of circumstances that justify an inference of retaliatory motive."[131] "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection."[132] When the temporal proximity is not sufficiently close, a plaintiff "must present other evidence—more than speculation, conjecture, or surmise—

---

[126] ECF No. 41 ¶ 133.

[127] *Id.*

[128] ECF No. 49 at 8 n.5.

[129] ADA retaliation claims based on circumstantial evidence, as Mr. Banks's claims are here, are subject to the *McDonnell Douglas* burden-shifting test in which a plaintiff must first prove "a prima facie case of retaliation by a preponderance of the evidence." *Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014).

[130] *Hermann v. Salt Lake City Corp.*, 21 F.4th 666, 679 (10th Cir. 2021).

[131] *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (internal quotation marks omitted).

[132] *Id.*

to establish" causation. [133] "The Supreme Court has likened this burden to a showing of 'but-for causation.'"[134]

Mr. Banks alleges that from June 2018 to August 2018 he made several requests for accommodation in the form of a transfer to a package car driver position in a cooler climate than Arizona, with a particular focus on an open position in Moab.[135] The protected conduct[136] thus preceded the first alleged adverse action, which occurred in January 2020, by almost a year and a half. Such a gap between the protected activity and the adverse action is too long to support an inference of retaliation based on temporal proximity alone.[137]

Mr. Banks claims, however, that he relies on more than temporal proximity because he has alleged that Mr. O'Riordan was involved in the January 2020, August 2020, and November 2020 decisions. While Mr. Banks offers conclusory allegations that Mr. O'Riordan held a retaliatory animus,[138] Mr. Banks has failed to allege facts that ground this supposed retaliatory animus in more than mere speculation. As alleged, on July 24, 2018, Mr. Banks contacted Mr. O'Riordan, who informed Mr. Banks that his prior driver position in Moab was still open.[139] Almost a year and a half later, on January 22, 2020, Banks alleges that he texted Mr. O'Riordan concerning an open position in Moab.[140] Subsequently, he was informed on a phone call with Mr.

---

[133] *Id*. (internal quotation marks omitted).

[134] *Ward*, 772 F.3d at 1203 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)).

[135] *See* ECF No. 41 ¶¶ 27–52.

[136] The Tenth Circuit recognizes "that a request for accommodation can constitute protected activity supporting a retaliation claim." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1188 (10th Cir. 2016). As UPS has not suggested otherwise, the Court will assume for the purposes of this Motion that Mr. Banks's requests for accommodation constituted protected conduct.

[137] *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a three-month period, standing alone, is insufficient to establish causation.").

[138] *See, e.g.*, ECF No. 41 ¶ 86.

[139] *Id*. ¶ 40.

[140] *Id*. ¶ 85.

Hodgson that Mr. O'Riordan had no interest in hiring Mr. Banks.[141] Mr. Banks then alleges that Mr. O'Riordan did not consider Mr. Banks in August 2020 for the Gypsum position for the same reasons Mr. O'Riordan did not consider Mr. Banks in January 2020.[142] Similarly, Mr. Banks alleges that Mr. O'Riordan did not consider Mr. Banks in November 2020 for the Moab position for the same reasons Mr. O'Riordan did not consider Mr. Banks in January 2020.[143] There is nothing in these allegations, however, from which the Court can plausibly infer that Mr. O'Riordan did not consider Mr. Banks for the positions *because* of Mr. Banks's 2018 accommodation requests. Indeed, whether Mr. O'Riordan was aware of the accommodation requests is, from these allegations, speculative.

As such, Mr. Banks has failed to plausibly allege a causal connection between his protected conduct and the three adverse actions. UPS is therefore entitled to judgment on the pleadings on these claims. The Court will dismiss the claims with prejudice.

## **ORDER**

For the reasons discussed above, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Judgment on the Pleadings in Part (ECF No. 47). Plaintiff's ADA discrimination claim for the failure to promote in January 2020 and Plaintiff's ADA retaliation claims are therefore DISMISSED WITH PREJUDICE. Plaintiff's ADA discrimination claims concerning the failures to hire in August 2020 and November 2020 remain.

DATED this 5th day of January 2026.        BY THE COURT:

Ann Marie McIff Allen
United States District Judge

---

[141] *Id.*
[142] *Id.* ¶ 90.
[143] *Id.* ¶ 93.